UNITED STATES of America, Appellee,

v.

Mark Alan KAYLOR, Appellant.

UNITED STATES of America,
Appellant,

v.

Mark Alan KAYLOR, Appellee.

Nos. 88–5393, 88–5394.

United States Court of Appeals,
Eighth Circuit.

Submitted April 13, 1989.

Decided June 8, 1989.

Daniel W. Schermer, Minneapolis, Minn., for appellant.

John M. Lee, Minneapolis, Minn., for appellee.

Before ARNOLD, Circuit Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Mark Alan Kaylor appeals his convictions after a jury trial on two counts of taking from a registered pharmacy by force or intimidation controlled substances which had a replacement cost to the registrant of not less than $500. 18 U.S.C. § 2118(a) (Supp. V 1987). Kaylor argues the following grounds for reversal: (1) that 18 U.S.C. § 2118(a) must fall as unconstitutionally vague; (2) failure to submit jury instructions defining the statutory terms "replacement cost" and "material or compound;" (3) insufficiency of the evidence to establish that the replacement cost of the substances stolen from each pharmacy was not less than $500; (4) prejudicial denial of Kaylor's motion to discover one of the pharmacies' inventory records; (5) failure to give Kaylor a speedy trial; and (6) admission of evidence illegally seized at the time of Kaylor's arrest. We reject these contentions and affirm the district court.[1]

## I. BACKGROUND

Ample evidence establishes that on November 22, 1987, a man identified as Kaylor held up the Nile Pharmacy in Minneapolis, Minnesota, taking cash and a quantity of narcotics. According to witnesses, Kaylor committed a similar robbery at the Clark Pharmacy in New Brighton, Minnesota, on December 12, 1987.

Police investigating the pharmacy robberies also suspected that Kaylor had robbed a Kentucky Fried Chicken restaurant in St. Anthony, Minnesota, on December 11, 1987, and had fled the scene in an automobile registered in the name of Leesa Forcier–Lindgren. On December 12, officers observed, stopped, and arrested a man driving this vehicle in Minneapolis. The

1. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

driver identified himself as Michael Lindgren, husband of the registered owner of the vehicle. Lindgren informed the officers that his wife, his daughter and a friend named "Bob," whose description fit Kaylor, occupied the Lindgrens' nearby residence.

Armed with arrest warrants for both Kaylor and Forcier–Lindgren,[2] police then proceeded to the Lindgren home. After arresting Forcier–Lindgren outside the residence and verifying the presence therein of a person answering Kaylor's description, police entered the home and arrested Kaylor in the basement. During a brief "protective sweep" of the basement, police observed numerous pharmaceuticals in plain view. After returning to the home with a search warrant three hours later, the officers discovered and seized other items linking Kaylor to the pharmacy robberies, including a mock .45 caliber pistol, a pair of gloves bearing rainbow emblems, numerous baggies containing various amounts of pills, several empty prescription bottles, and four Clark Pharmacy labels.

Kaylor was arraigned on the Nile Pharmacy charge on January 20, 1988. On February 1, 1988, he filed motions, among other things, to suppress evidence seized at the time of his arrest and to declare section 2118(a) unconstitutional. Kaylor was arraigned on the Clark Pharmacy charge on March 14, 1988, the date originally set for his trial for the Nile Pharmacy robbery. At this time, the district court granted the Government's motion to join the indictments and moved the trial date to May 4. Kaylor filed further motions on April 15 to obtain access to Clark Pharmacy records and to declare section 2118(a) unconstitutional. On May 4, the day of trial, the district court denied Kaylor's motions to suppress and to gain access to the pharmacy records.

At trial, the Government offered two types of proof that the replacement cost of the drugs stolen from each pharmacy met or exceeded the statutory minimum of $500. The Government first established that the Nile Pharmacy replaced its stolen drugs three months after the robbery for $500.21. The Government also showed that the "average wholesale price" of the substances stolen from each pharmacy exceeded $500. The "average wholesale price" is a national list price found in a monthly trade price journal commonly called the "red book."

A jury returned guilty verdicts on both indictments. Kaylor was sentenced to two concurrent eighteen-year prison terms. On July 11, 1988, the district court denied Kaylor's motions for judgment of acquittal, for new trial, and to declare section 2118(a) unconstitutional. This appeal followed.

## II. DISCUSSION

### A. Challenge to Section 2118(a) as Unconstitutionally Vague

■ The provision of the Controlled Substance Registrant Protection Act pertinent to this prosecution reads:

Whoever takes or attempts to take from the person or presence of another by force or violence or by intimidation any material or compound containing any quantity of a controlled substance belonging to or in the care, custody, control, or possession of a person registered with the Drug Enforcement Administration under section 302 of the Controlled Substances Act (21 U.S.C. 822) [21 USCS § 822] shall, except as provided in subsection (c), be fined not more than $25,-000 or imprisoned not more than twenty years, or both, if (1) the replacement cost of the material or compound to the registrant was not less than $500 * * *.

18 U.S.C. § 2118(a) (Supp. V 1987).

Kaylor asserts that the statute is unconstitutionally vague because it permits arbitrary enforcement by failing to specify whether "replacement cost * * * to the registrant" means an average wholesale price or the actual cost to the pharmacy of replacing the stolen drugs. Kaylor notes

---

**2.** Officers had discovered an outstanding bench warrant for the arrest of Forcier–Lindgren on a

charge relating to a faulty tailpipe and muffler.

that the Nile Pharmacy incurred an actual replacement cost of more than $500 only because a price increase occurred during the three months between the robbery and replacement. Moreover, the average wholesale price figures the Government submitted in evidence exceeded the discounted prices the pharmacies would have paid if they actually had replaced the drugs at or near the time of the robberies.

Kaylor also argues that section 2118(a) is vague because it fails to define the term "material or compound." Specifically, Kaylor contends that the statute permits arbitrary enforcement by granting pharmacists discretion to base their replacement cost calculations on the prices of either the brand-name drugs stolen or their cheaper generic equivalents.

The void-for-vagueness doctrine evolved from the due process clauses of the Fifth and Fourteenth Amendments. *United States v. Articles of Drug*, 825 F.2d 1238, 1243 (8th Cir.1987). Due process requires that laws provide notice to the ordinary person of what is prohibited and standards to law enforcement officials to prevent arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972); *D.C. v. City of St. Louis*, 795 F.2d 652, 653 (8th Cir.1986). In determining whether a statute is impermissibly vague, courts generally look to "the common usage of statutory language, judicial explanations of its meaning, and previous applications of the statute to the same or similar conduct." *Postscript Enters., Inc. v. Whaley*, 658 F.2d 1249, 1255 (8th Cir. 1981) (quoting *Balthazar v. Superior Court*, 573 F.2d 698, 700 (1st Cir.1978)).

We reject Kaylor's contention that section 2118(a) should be voided as unconstitutionally vague because it fails to define the terms "replacement cost" and "material or compound." The common meaning of these phrases provides both adequate notice of the conduct prohibited and standards for enforcement. The fact that the Government may prove the elements of the crime by several methods does not render the statute vague. Thus, we reject the constitutional challenge to the law.

**B. Challenge to the Convictions Based on "Replacement Cost"**

Kaylor also challenges the jury's conviction as erroneous because of the district court's failure to specifically define to the jury the term "material or compound" or to instruct that "replacement cost" should include wholesale discounts available to the particular pharmacy and the lesser cost of generic equivalents for stolen brand-name drugs. Additionally, Kaylor asserts that the Government presented insufficient evidence that the replacement cost of the drugs taken from each pharmacy met or exceeded $500.

■ Initially, turning to the instruction relating to the statute, the court stated to the jury the following as elements of the offense:

Four essential elements are required to be proved in order to establish the offense charged in the indictment:

First: The act of taking, from the person or presence of another, any material or compound containing any quantity of a controlled substance belonging to or in the care, custody, management, or possession of a person or pharmacy registered with the Drug Enforcement Administration;

Second: The act of taking such controlled substance by force or violence or by means of intimidation;

Third: The material or compound containing any quantity of a controlled substance stolen must have a replacement cost to the pharmacy of not less than $500.00;

Fourth: Doing such act or acts willfully.

To convict a defendant of robbery of a federally registered pharmacy, the Government must prove each of these essential elements beyond a reasonable doubt.

(T. at 660–61). This instruction adequately covered the necessary elements of the crime.

Kaylor sought an instruction that would take the price of a generic equivalent as a replacement cost for drugs taken from the Clark Pharmacy. No authority supports the giving of such an instruction which would require substitution of the replacement cost of generic drugs for the cost of stolen brand-name drugs. We think the trial court adequately defined replacement cost to the jury as follows:

> The replacement cost of the materials or compounds containing controlled substances should be determined separately for each indictment. The replacement cost for each pharmacy is the amount of money necessary to replace the materials or compounds stolen. If the replacement cost to the registrant is less than $500.00 for the offense charged, you must find the defendant not guilty of that charge.

(T. at 664–65).

■ Although no case appears to define the statutory phrase "replacement cost * * * to the registrant," we think it self-evident that when replacement occurs within a reasonable time after the robbery, the Government must prove that the registrant incurred an actual cost of at least $500 in replacing the stolen items. On the other hand, when replacement does not occur within a reasonable time, the proof should establish the amount of money, not less than $500, necessary for the registrant to replace the stolen items. In such cases, the average wholesale price for those items at or near the time of the robbery may establish the replacement cost to the registrant. This calculation comports with the lone piece of legislative history on point, a House report which states that Congress used the term "replacement cost" in an effort to assure "that Federal jurisdiction will be applied with a high degree of uniformity across the nation without need to take into account the variations in markup between different retailers." H.R. No. 644, 98th Cong., 2d Sess. 5, *reprinted in*

1984 U.S.Code Cong. & Admin. News 521, 525.[3]

■ In this case, the Government presented adequate proof that the replacement cost to each pharmacy exceeded the statutory minimum, although Kaylor controverted that proof at trial. As to the Nile Pharmacy, the owner used the October 1987 "red book" to calculate the average wholesale price of the stolen drugs at $612.23. Three months later, and after the return of the indictment, the pharmacy replaced all of the allegedly stolen drugs at a cost of $500.21. As to the Clark Pharmacy, the pharmacist in charge estimated the quantity of drugs taken and, using the average wholesale price, estimated the replacement cost at $883.06. Subtracting available discounts, he estimated the actual replacement cost at no less than $775.00. Thus, the issue of replacement cost to each pharmacy rested with the jury upon the evidence presented by the prosecution and the defendant.

■ Finally, Kaylor argues that the trial court abused its discretion in denying him access to inventory and sales records of the Clark Pharmacy. Kaylor sought these records as a basis to perform an audit to challenge the Government's proof of the amounts of drugs stolen. The magistrate denied discovery, and the district court affirmed on the basis of relevancy.

Because the request called upon the pharmacy to produce thousands of retained prescription orders, we believe the ruling rested within the proper discretion of the district court. Moreover, Kaylor fails to show any prejudice from the ruling. *See United States v. Woosley*, 761 F.2d 445, 449 (8th Cir.1985). The request called for records of Schedule II drugs, but Schedule III drugs also had been taken in the robbery. Therefore, Kaylor could not have performed an accurate audit based on the requested records.

---

**3.** Testimony at trial indicated that the average wholesale price of a particular drug generally exceeds by 20–25% the actual costs to pharmacies after discounts from wholesalers (T. 627). This does not, however, render the average wholesale price an unfair or improper measure.

Analogous statutes setting forth jurisdictional thresholds based on the value of stolen property often require use of whichever of the alternative calculations results in the greatest value amount. *See, e.g.,* 18 U.S.C. §§ 641, 2314 (1982).

## C. Speedy Trial

Kaylor contends that the 105–day delay between his January 20, 1988, arraignment on the Nile Pharmacy charge and the commencement of his trial on May 4 denied him his right to a speedy trial as guaranteed by the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. § 3161 et seq. (1982 & Supp. V 1987). We disagree.

■ The sanction for a violation of the Speedy Trial Act is dismissal of the indictment "on motion of the defendant." 18 U.S.C. § 3162(a)(2). The record indicates, however, that Kaylor failed to file a pretrial motion to dismiss the indictment on speedy trial grounds. Therefore, Kaylor has waived his remedy under the Act. *United States v. Antwine*, 873 F.2d 1144, 1149 (8th Cir.1989); *United States v. Ferguson*, 776 F.2d 217, 222 (8th Cir.1985), *cert. denied*, 475 U.S. 1020, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986).

■ We also conclude that the delay did not violate Kaylor's right to a speedy trial under the Sixth Amendment. In considering Sixth Amendment speedy trial claims, we look to four factors: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). In this case, the 105–day delay between Kaylor's indictment and trial on the Nile Pharmacy charge was relatively brief. Some of this delay included time necessary to conduct hearings and rule upon Kaylor's own pretrial motions. Moreover, the only prejudice Kaylor alleges is a "spillover effect" of evidence in the two cases that resulted, if at all, from the joinder of the indictments rather than from any delay. Finally, as noted above, Kaylor never asserted his speedy trial right before the district court. Thus, we conclude that no Sixth Amendment violation occurred under the *Barker* standards.

## D. Suppression of Evidence

■ Kaylor maintains that the district court should have granted his motion to suppress the evidence seized at the time of his arrest because the police did not obtain a search warrant before entering the Lindgren home. Assuming that Kaylor has standing to raise this claim,[4] we hold that the entry of the home did not violate Kaylor's Fourth Amendment privacy interests.

Under *Payton v. New York*, 445 U.S. 573, 602–03, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), the police could have entered Kaylor's own home without a search warrant to execute a warrant for his arrest if they had reason to believe he was inside. The arrest warrant would have sufficiently protected his Fourth Amendment rights. *Id.* Kaylor cannot claim any greater Fourth Amendment protection in the Lindgren home than he possessed in his own home. *United States v. Clifford*, 664 F.2d 1090, 1092–93 (8th Cir. 1981). Therefore, the possession of a warrant for Kaylor's arrest and the officers' reasonable belief of his presence in the Lindgren home justified the entry without a search warrant. *Id.* at 1093; *cf. United States v. McIntosh*, 857 F.2d 466, 468–69 (8th Cir.1988) (distinguishing *Clifford* because police possessed arrest warrant for absent third party rather than for defendant who was guest in home).[5]

---

4. To possess standing to challenge the search of a third party's home, a defendant must have had a legitimate expectation of privacy in that home at the time of his arrest. *United States v. Wiley*, 847 F.2d 480, 481 (8th Cir.1988) (per curiam). In this case, the district court adopted the magistrate's finding that Kaylor possessed such a privacy interest in the Lindgren home because he had been staying in the basement for a short time and kept some of his possessions there. The Government does not challenge this determination on this appeal.

5. Kaylor contends that *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), prevents the Government from using the arrest warrant to justify entering the Lindgren home. *Steagald*, however, does not apply to this case for two reasons. First, *Steagald* addressed only the right of a third party not named in the arrest warrant to the privacy of his or her home. This right is personal to the homeowner and cannot be asserted vicariously by the person named in the arrest warrant. *United States v. Underwood*, 717 F.2d 482, 484 (9th Cir.1983), *cert. denied*, 465 U.S. 1036, 104 S.Ct. 1309, 79 L.Ed.2d 707 (1984). Second, the police in this case also executed an arrest warrant for Forcier–Lindgren. This warrant pro-

■ Kaylor also challenges the protective sweep search the police conducted throughout the entire basement immediately after arresting him. Courts have recognized an exception to the warrant requirement for sweep searches incident to arrest when police reasonably suspect that other persons could be on the premises who could pose a danger to the officers' safety, *United States v. Bruton*, 647 F.2d 818, 822 (8th Cir.), *cert. denied*, 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981), or destroy evidence, *United States v. Hoyos*, 868 F.2d 1131, 1138 (9th Cir.1989); *United States v. Gerry*, 845 F.2d 34, 36 (1st Cir.1988); *United States v. Vasquez*, 638 F.2d 507, 530 (2d Cir.1980), *cert. denied*, 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981). Both of these concerns justified the security sweep of the Lindgren basement in this case.

The police arrested the Lindgrens directly in front of the home, potentially alerting all of those inside. Although the Lindgrens indicated that only "Bob" occupied the basement, Forcier–Lindgren was sleeping when officers arrived, and police had not kept the home under surveillance to determine exactly how many people remained inside. In addition, the drugs involved were of a type and quantity easily disposed of through household plumbing. Finally, police reasonably suspected that Kaylor kept a gun somewhere in the basement that an unseen person could have used against the arresting officers. These exigent circumstances justified the sweep search. *See United States v. Standridge*, 810 F.2d 1034, 1037–38 (11th Cir.), *cert. denied*, 481 U.S. 1072, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987) (upholding admission of evidence discovered in plain view during sweep search of motel room and adjoining bathroom incident to arrest of suspected armed bank robber).

vided an independent justification for entering her home to conduct a protective sweep, even if police arrested her outside. *See United States v. Hoyos*, 868 F.2d 1131, 1139 (9th Cir.1989).

6. The Government cross-appealed from the district court's judgment declaring unconstitutional the Sentencing Guidelines promulgated by the

### III. CONCLUSION

For the reasons stated above, we affirm the judgment of the district court.[6]

United States Sentencing Commission. The Supreme Court subsequently upheld the constitutionality of the Guidelines in *Mistretta v. United States*, —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Because the Government did not address this issue in its brief, however, we dismiss the cross-appeal for failure to prosecute.