**UNITED STATES, Plaintiff,**

v.

**Jose MENDOZA, Defendant.**

**No. 2:03–CR–291 TS.**

United States District Court,
D. Utah,
Central Division.

Aug. 23, 2004.

David F. Backman, U.S. Attorney's Office, for Plaintiff.

Ronald J. Yengich, Yengich Rich & Xaiz, Benjamin A. Hamilton, Sharon L. Preston, Jesse S. Brar, Salt Lake City, UT, Todd A. Utzinger, Utzinger & Perretta, Bountiful, UT, for Defendant.

## MEMORANDUM ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

STEWART, District Judge.

Defendant Jose Mendoza's Motion to Suppress seeks the exclusion of evidence obtained by police in connection with their presence in his home on the morning of February 14, 2003, when they executed a warrant for Mr. Mendoza's arrest. Mr. Mendoza seeks the suppression of firearms and ammunition found in his home during the arrest, as well as statements drawn from him by the police, all of which he alleges were obtained in violation of his rights under the Fourth Amendment of the U.S. Constitution. For the purposes of this motion, the parties have stipulated to the facts summarized below, now adopted by the Court as official findings of fact.

## I. Findings of Fact

On January 15, 2003, Leobardo Serrano reported to the police that he had been assaulted that day by Mr. Mendoza and his brother Cesar. Mr. Serrano had called Mr. Mendoza to notify him that he would no longer work for Mr. Mendoza, and Mr. Mendoza responded angrily. When Mr. Serrano visited Mr. Mendoza's home to return his work clothes, Mr. Mendoza became verbally abusive, causing Mr. Serrano to run back to his car. As he was running, Cesar Mendoza lassoed him to the ground. Mr. Mendoza approached Mr. Serrano with a knife and brandished it over him, cutting him on the right hand. While Mr. Serrano remained on the ground in the lasso, Mr. Mendoza and Cesar Mendoza beat and whipped him with a brown leather whip. When Mr. Serrano was able to get to his car to drive away, he saw Mr. Mendoza waving a handgun in his direction. He reported that the gun was probably a .40 or .45 caliber handgun. Mr. Serrano received several bruises and marks from the beating, which were photographed by police when he reported the encounter.

Future accounts of the incident, made by Mr. Serrano to other police officials also related that Mr. Mendoza's house had a surveillance system that could record movements outside the house. Mr. Serrano also reported that the day after the initial assault, Mr. Mendoza and Cesar showed up at Mr. Serrano's house and wrote down the license plate numbers of

his vehicles. On that occasion, Mr. Mendoza had a handgun in his waist band.

Not long after Mr. Serrano's experience with the Mendoza brothers, authorities became aware of another situation in which the Mendozas were accused of mistreating former employees. Roberto Gambino worked for Mr. Mendoza in Colorado, but quit after a few days. When he appeared at Mr. Mendoza's home to collect his check, he was paid and then lassoed two times before he could leave the premises. All reports of both incidents at Mr. Mendoza's home reported that Cesar was present at the home.

Based on information provided by Mr. Serrano, and to a lesser extent, Mr. Gambino, police obtained arrest warrants for both Mendoza brothers. On February 14, 2003, police officers visited the homes of both men simultaneously to execute the arrest warrants. The arresting officers had been briefed on the history of the case, including the presence of a surveillance system, the possession by Mr. Mendoza of a handgun, and the times in the past when Cesar had been present at Mr. Mendoza's home. Based on these facts and the Mendozas' past acts of violence, officer safety concerns were also discussed at the briefing.

At 7:00 a.m., four to five officers knocked at Mr. Mendoza's home. Mr. Mendoza answered and allowed the police into the entryway, where it was clear that more people were present in the adjoining kitchen—all women. The officers arrested Mr. Mendoza, and allowed him to sit down in his home, after he requested a chance to discuss the arrest before they took him from his home. During the arrest, at least two officers searched the bedrooms in the adjoining hallway in order to secure the premises while the police remained in the building. The search was limited to places where a person could have been hiding. Finding people in the first two bedrooms, they entered the third bedroom, and found two rifles and some ammunition in the walk-in closet.

Another officer then asked Mr. Mendoza if there were other guns in the house. Mr. Mendoza indicated that there was one under the bedroom mattress. Officers found a .45 caliber handgun under the mattress. Officers then asked Mr. Mendoza about his legal status in the United States. He admitted that he was in the United States illegally. He was not read his *Miranda* rights.

On April 10, 2003, after Mr. Mendoza was released on bail and then re-arrested, Mr. Mendoza was read his *Miranda* rights and waived them, verbally and in writing. He then signed a statement admitting that his presence in the United States was illegal, that he owned the guns found at his home, and detailing his purchase of the guns and what kind of guns he had bought.

## II. Discussion

Before evaluating the merits of the Motion to Suppress, the Court can eliminate certain issues from consideration, as they have been conceded by the parties. First, the government concedes that the rifles found in the walk-in closet may not be used as evidence.[1] Second, the government concedes that Mr. Mendoza's responses to questions about his legal status, asked before his *Miranda* rights had been read, should be suppressed.

1. The Government does not concede that the knowledge of the firearms was gained unconstitutionally. It argues that if the protective sweep was valid, the government could have knowledge that the rifles were in the closet, and use that knowledge for other investigatory purposes. It concedes only that the rifles should not have been seized, and therefore cannot be physically used at trial, barring some other means of admitting them.

The remaining issues are as follows: 1). Was the protective sweep of the home, which produced the police knowledge of the rifles in the closet, valid? 2). Did the question of whether there were any other guns in the home, asked of Mr. Mendoza during the arrest, and the search for and seizure of the handgun, violate his *Miranda* rights? 3). Was Mr. Mendoza's April 10, 2003 statement elicited based on evidence obtained by police in violation of Mr. Mendoza's Fourth Amendment rights?

## A. The protective sweep

The government argues that the brief search of the home during the arrest was justified as a protective sweep under *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Under *Buie,* police undertaking an in-home arrest may conduct a protective sweep of "closets and other spaces immediately adjoining the place of an arrest from which an attack could be immediately launched." *Id.* This kind of sweep is necessary for officer safety, and need not be based on reasonable suspicion or probable cause. *Id.* A second kind of search, in which areas not adjacent to the site of the arrest may be searched for persons, requires that police possess "articulable facts which, taken together with rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334, 110 S.Ct. 1093.

Mr. Mendoza argues that no protective sweep could have been justifiably carried out in his home, because officers could have left the home immediately after arresting him, thereby avoiding the risks which a protective sweep would have sought to eliminate. This argument is premised on the *Buie* mandate that the protective sweep may not last longer than it takes to complete the arrest and leave the premises. *Id.* at 335, 110 S.Ct. 1093.

While it is true that the officers could have quickly left, it is not clear that they had a duty to do so in the present case. Even though they initially appear to have intended to leave the home immediately after the arrest, police were requested by Mr. Mendoza to stay, to give Mr. Mendoza opportunity to persuade them not to arrest him. Mr. Mendoza's invitation to stay inside the home justified the officers in remaining there, even after they had arrested Mr. Mendoza. *See Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)(Fourth Amendment rights of privacy in home may be waived by consent to police presence there). To argue that they were unjustified in taking steps to secure the areas adjoining the room where they were rightfully located would be illogical. Mr. Mendoza has cited no legal authority for the proposition that the officers were compelled to leave the home immediately, after having been invited to stay.

Based on the above, the Court finds that the officers were entitled to be in the home during and immediately after the arrest. Their justifiable presence there also gave them the right to conduct a *Buie*-style protective sweep in the spaces immediately adjoining the entryway and living room. However, the bedroom in which the firearms were found was at the end of an adjoining hall, rather than immediately adjacent to the main living area. The question remains whether the search of the third bedroom may be justified under the first *Buie* provision, which allows searches of the immediate area from which an attack may be launched, or whether the search falls under the second *Buie* prong, requiring articulable facts that would warrant a reasonable suspicion that an attacker could have been concealed there.

### 1. "closets and spaces immediately adjoining the place of arrest . . ."

 The government does not appear to argue that the third bedroom—where the firearms were found—could be searched under the first prong of *Buie*. Rather, the government's theory seems to be that the officers were justified in searching the first room under the first prong, and from that search gained knowledge of articulable facts sufficient to search the second and third rooms, where they found the firearms. Thus, the arguments concerning the first prong of *Buie* are limited to whether police were entitled to search the first bedroom, which appears to have been immediately adjacent to the living area where the arrest was taking place. Mr. Mendoza does not argue that police were not entitled to enter the first room, so the point is conceded. The Court holds that the police were constitutionally permitted to enter the first bedroom under the first prong of *Buie*, because it was immediately adjacent to the site of the arrest. Of course, this conclusions means that whatever facts they gleaned from their entry into the first room could permissibly be used to decide whether to enter the other rooms.

### 2. "articulable facts" which warrant searches of non-adjacent areas

 This leaves the second and third bedrooms, neither of which were literally adjacent to the entry area. The second room can be set aside, since police entry there would only be legally significant if a) police found evidence of a crime there, or b) police relied on facts learned there to justify entry into the third room. Assuming for the moment that neither is the case, the Court can evaluate whether or not police possessed sufficient articulable facts to justify a prudent officer in believ-ing that the third bedroom harbored a possibly dangerous person. *See Buie.*

The following is a list of facts known by the police which the government argues justified the search of the third bedroom:

1. Mr. Mendoza was aided in his alleged assaults by his brother, Cesar, who was at Mr. Mendoza's house at the time of the assaults.

2. Cesar had been accused of violent behavior.

3. At least six people were present in the home (Mr. Mendoza, his wife, two women in the kitchen, and the older couple sleeping in the first bedroom).[2]

4. Mr. Mendoza was alleged to possess a handgun and knife, neither of which was accounted for at the time of the arrest, and both of which had been seen in his hands in front of that very home a month earlier.

5. The occupants of the home could have seen the police approaching the home via the external surveillance system.

6. The time of the arrest was 7:00 in the morning.

The government has also offered the following inferences which it claims could reasonably be drawn from the above facts:

1. The presence of that many people at that time of day suggested the likelihood that Mr. Mendoza's extended family was living in his home, which could include Cesar.

2. The presence of that many people, combined with the possibility of the handgun and knife being in the home presented an inherently dangerous situation.

The Eighth Circuit case *United States v. Kaylor*, 877 F.2d 658, 664 (8th Cir.1989) dealt with facts similar to those listed

---

**2.** This does not count the children sleeping in the second bedroom.

above. In *Kaylor*, the protective sweep of an arrestee's home conducted by police was upheld because police had no idea how many people were in the home and also had reason to believe there was a weapon inside the home. This combination of unknown number of people and unaccounted-for weapons presented facts sufficient to justify wide-ranging protective sweeps in other cases as well. *See United States v. Brown* 217 F.3d 605 (8th Cir.2000); *U.S. v. Barker*, 27 F.3d 1287 (7th Cir.1994).

In the case at bar, the conclusion that another person, possibly dangerous, could have been hiding in the third bedroom with access to the handgun or knife known to be used by Mr. Mendoza was reasonable based on the facts and case law detailed above. The Court finds this case very different from that offered as an analogy by Mr. Mendoza, *U.S. v. Hogan*, 38 F.3d 1148 (10th Cir.1994). In *Hogan*, police arrested a suspect outside his home, and then conducted a two-hour 'protective sweep' inside the home based only on the facts that they believed the suspect had an accomplice when he committed a crime, and that the suspect's girlfriend may have left her child in the house. *See Id.* Mr. Mendoza, on the other hand, had a house full of people, a missing, violent accomplice, a hidden weapon and a surveillance system, and the arresting officers were inside his home by invitation. These facts combine to justify the officers in thinking that they were at risk while they remained in the house. Therefore, the protective sweep of the third bedroom was constitutional. While the government has conceded that the actual firearms found in the bedroom should be suppressed, the discovery and knowledge of those firearms may be admitted at trial.

## B. Seizure of the handgun

■ After the protective sweep was completed and the rifles were found in the closet, officers asked Mr. Mendoza if there were other guns in the house. He told them that there was a handgun in between the mattresses of his bed in the third bedroom. At that point, no one had read Mr. Mendoza his *Miranda* rights. The government concedes that this questioning constituted custodial interrogation, but argues that it was appropriate under the "public safety exception" outlined in *New York v. Quarles*, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In the *Quarles* case, the Supreme Court held that some circumstances justify interrogation without a reading of the *Miranda* rights, because "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."

Mr. Mendoza argues that the public safety exception is not applicable here, because the gun was in a private residence, and therefore posed no threat to members of the general public. This argument shows a misunderstanding of the scope of the public safety exception. *Quarles* sets out the exception not only in the interest of the safety of public, but that of the arresting officers as well. *See Id.* at 659, 104 S.Ct. 2626. The importance of officer safety as an element of the public safety exception has been more fully fleshed out by the Tenth Circuit in *U.S. v. Lackey*, 334 F.3d 1224, 1228 (10th Cir.2003). These cases carve out an exception to the *Miranda* requirements where, as here, there is a reasonable belief that the arrestee has information concerning a potential threat to the officers.

■ In this case, Mr. Mendoza's loaded gun lay between the mattresses of his bed, just down the hallway from the officers in a crowded home. Although police had verified by then that Cesar was not in the home, they could not be sure that one of

the other seven occupants of the home wouldn't try to use it against them. The officers had a reasonable belief that the gun was there, and that it posed a threat to them. It would be unwise to elevate *Miranda* rights to so high a level that it requires police to operate in dangerous circumstances without the ability to seek information about the threats they face. Because the question about other firearms in the home was permissible, the Court will not suppress Mr. Mendoza's admission about the location of the gun.

 Finally, it follows that the limited search of the mattresses where the police found the gun was also valid. Police had a right, as explained above, to the knowledge of its location, and were reasonable in assuming the gun posed a threat. Finally, because it matched the description of the gun used during the assault, officers were reasonable in believing that there was a nexus between the gun and the crime. *See Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)(requiring a nexus between the criminal act and the weapon seized). Accordingly, they acted properly in seizing the weapon.

**C. Statements made on April 10, 2003**

■ The final contention of Mr. Mendoza's Motion to Suppress is that the statement he signed on April 10, 2003 should be suppressed as the fruit of the poisonous tree. Having already determined which police searches and seizures were valid and which were not,[3] the Court need only decipher whether the statement was elicited based on permissible or impermissible police actions.

A reading of Mr. Mendoza's signed statement shows that it is unconnected with the two police actions which have

---

**3.** Although the Court did not find any police action invalid, the government concedes that the seizure of the rifles and the questioning of

been conceded as unconstitutional. While the statement alludes to the rifles found in the search of Mr. Mendoza's home, it presents no problem given that the protective sweep that produced the rifles was permissible. The mention of the handgun found between Mr. Mendoza's mattresses is similarly harmless, since police were justified in searching for, and seizing, that weapon. Accordingly, the April 10, 2003 statement presents no Fourth Amendment difficulties, and will not be suppressed.

In conclusion, Mr. Mendoza's Motion to Suppress is DENIED, except inasmuch as it seeks the suppression of the physical evidence of two rifles, and Mr. Mendoza's statements of February 14, 2003, about his legal status.

SO ORDERED.

Mr. Mendoza about his legal status were impermissible.