Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
02/23/2016 08:25 AM CST

State of Nebraska, appellee, v.
Joseph R. Lowery, appellant.
___ N.W.2d ___

Filed February 23, 2016.    No. A-14-721.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Arrests: Warrants: Search and Seizure: Police Officers and Sheriffs.** The interests protected by arrest warrants and search warrants differ: An arrest warrant primarily serves to protect an individual from an unreasonable seizure, whereas a search warrant safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

3. **Constitutional Law: Arrests: Warrants: Probable Cause.** If a person is arrested pursuant to a valid arrest warrant, it does not matter whether the arrest occurs in his or her own home or in the home of another, as long as there is either reasonable belief or probable cause to believe that the subject of the arrest warrant is within the home; no search warrant, consent, or exigent circumstances are required in order to protect the Fourth Amendment rights of the subject of the arrest warrant.

4. **Constitutional Law: Search and Seizure: Standing.** A "standing" analysis in the context of search and seizure is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment.

5. **Constitutional Law: Search and Seizure.** The test used to determine if a defendant has an interest protected by the Fourth Amendment is

whether the defendant has a legitimate or justifiable expectation of privacy in the premises. Ordinarily, two inquiries are required: First, an individual must have exhibited an actual (subjective) expectation of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable.

6. \_\_\_\_: \_\_\_\_. An overnight guest has an expectation of privacy in his or her host's home, which society is willing to recognize as reasonable, and, therefore, the overnight guest has standing to assert Fourth Amendment violations.

7. \_\_\_\_: \_\_\_\_. An overnight guest's legitimate expectation of privacy does not extend to areas of the host's home which are off limits to the guest or of which the guest has no knowledge.

8. **Search and Seizure: Standing.** A defendant can prevail on a fruit of the poisonous tree claim only if he has standing regarding the violation which constitutes the poisonous tree.

Appeal from the District Court for Scotts Bluff County: Leo Dobrovolny, Judge. Affirmed.

Jose L. Rodriguez, Deputy Scotts Bluff County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Pirtle, Riedmann, and Bishop, Judges.

Bishop, Judge.

Following a jury trial, the district court for Scotts Bluff County, Nebraska, convicted Joseph R. Lowery of possession with intent to distribute a controlled substance (methamphetamine). Lowery appeals, arguing the district court erred in overruling his motion to suppress evidence. We affirm.

## BACKGROUND

On January 8, 2014, the chief of police of Mitchell, Nebraska, Michael Cotant, recognized a green, Chevy pickup truck (with a "14 County, Nebraska" license plate) parked in the driveway of George Valles' home on Center Avenue in Mitchell. Chief Cotant had previously seen the Chevy on several occasions

in December 2013 at a trailer park in Mitchell; Valles lived in the trailer park at the time. When Chief Cotant "ran" the Chevy's license plate number, he learned that it was registered to Lowery and another person, with an address in Roseland, Nebraska. On January 9, Chief Cotant followed up on Lowery's name, which he recognized, and learned that Lowery and his brother had warrants out for their arrests for unpaid fines and court costs. Chief Cotant prepared a packet of information containing photographs of Lowery and his brother, the registration information for the Chevy, and copies of the arrest warrants for Lowery and his brother, and left it for Officer Joshua Catlin of the Mitchell Police Department.

When Officer Catlin came on duty the morning of January 10, 2014, he received the packet of information prepared by Chief Cotant. Officer Catlin recognized the description of the Chevy from having seen it prior to that day, and he said he "ran the plate" himself. He drove by the residence on Center Avenue at approximately 8:25 a.m. and observed the Chevy parked on the street in front of the residence. Officer Catlin then contacted Deputy Sheriff David Ojeda of the Scotts Bluff County Sheriff's Department (who had been tasked with finding and arresting Lowery's brother) to see if he would be able to assist Officer Catlin in arresting Lowery. Officer Catlin and Deputy Ojeda met around 9 a.m. in Mitchell and updated each other on the information they had. Deputy Ojeda then had the Chevy's "license plate run" again. Deputy Ojeda was advised by the communications center that there was a protection order on Lowery out of Adams County and that he should use caution because Lowery was known to carry a gun, was violent toward other people, and had fled when the protection order was being served on him. At that point, Officer Catlin went back to the residence to monitor the Chevy, while Deputy Ojeda called for additional assistance.

Law enforcement arrived at the residence around 10 a.m. The group of seven split up and surrounded the residence. Officer Catlin was part of the group that went around to the

back of the house. Deputy Ojeda and his group went to the front door. Deputy Ojeda knocked, and Valles' wife answered the door holding a baby. She stated that she lived in the residence. Deputy Ojeda then asked her several times whether Lowery was in the house, and each time she said that she did not know. Deputy Ojeda asked Valles' wife if they could come in, and she motioned them into the house. Once inside, Deputy Ojeda continued to ask Valles' wife about whether Lowery was in the house. At that point, Valles walked into the living room and said he was the owner of the house. Deputy Ojeda asked Valles if Lowery was in the house, and Valles stated that he did not know. At some point, Deputy Ojeda heard on his radio that officers behind the residence saw somebody "peeking through the shades in the back room." Deputy Ojeda asked Valles if Lowery was "in the back of the house," and he said no. Deputy Ojeda told Valles that they had an arrest warrant for Lowery and his brother, that the green Chevy outside was registered to Lowery, that officers had seen someone peeking through the back windows, and that Deputy Ojeda thought Valles was hiding either Lowery or his brother. Valles told Deputy Ojeda he "needed to step outside as he didn't see a warrant." The officers stepped outside, and Deputy Ojeda radioed Officer Catlin to bring the arrest warrants to the front door, which were then shown to Valles. Valles told the officers that no one was in the house but him, his wife, and their child.

After showing Valles the arrest warrants, the officers again entered the house and Valles took them to the back bedroom. How that came to pass is not entirely clear from our record. Officer Catlin testified that officers behind the residence again radioed there was movement in the back bedroom and that because he and Deputy Ojeda could see Valles, his wife, and the baby, Deputy Ojeda told Valles they were going to search and Valles needed to take the officer to the back bedroom. Deputy Ojeda, however, testified that he urged Valles to let them in (as neighbors were starting to come out of their houses

and he did not want to make a scene) and that they would arrest Lowery and leave; he said that Valles stepped back inside and started walking to the back of the house and Deputy Ojeda followed him. Either way, officers ended up back inside the house and at the door of the back bedroom. Officer Catlin testified that Valles knocked on the door and said, "'If there is anybody in there, open the door, come out.'" At that point, Lowery came out of the room and was arrested and taken outside to a patrol car. Deputy Ojeda testified that Valles knocked on the door, and someone inside said, "'Who is it?'" Valles responded, "'It's the cops.'" Then Lowery opened the door and was arrested.

After Lowery was arrested, Deputy Ojeda asked Valles about another room, which was locked (earlier when Deputy Ojeda was on the way to the back bedroom where Lowery was found, he had tried to turn the doorknob to this other room, but it was locked). Valles said it was his room, he always kept it locked, and nobody ever went in there. Officers told Valles to get the key and open the door; the officers apparently thought Lowery's brother might be in there. Valles retrieved the key and unlocked the door. Upon entering the room, officers saw in plain view drug paraphernalia and "designer baggies" known to be commonly used to package controlled substances; they also saw a shotgun case and handgun in the closet when checking to make sure no one was hiding in the closet. This evidence formed the basis for a later search warrant. Law enforcement subsequently executed the search warrant that same day and found drugs, paraphernalia, and other incriminating evidence in Valles' room, the room Lowery had been in, and other areas of the home. Among the items found in the room Lowery had been in was more than 10 grams of methamphetamine in a wood box under the bed.

Lowery was charged with possession with intent to distribute a controlled substance (methamphetamine), a Class II felony.

Lowery filed a motion to suppress all relevant evidence on the ground that it had been obtained in violation of the Fourth

Amendment. At the hearing on the motion to suppress, Lowery specifically challenged the two initial searches (the search for Lowery and the search of Valles' locked bedroom) and argued that the affidavit offered in support of the search warrant was inadequate, in that it was based on the fruits of those prior, allegedly illegal searches. At the hearing on the motion, Officer Catlin, Deputy Ojeda, and Chief Cotant generally testified to the facts set forth above, and copies of the search and arrest warrants were received into evidence.

The district court overruled Lowery's motion to suppress. The court determined that the officers' initial entry into the house was proper because a resident of the house, Valles' wife, let them in. The court also determined that the reentry into the house to search for Lowery was proper because officers had an arrest warrant for him and reasonably believed that he was in the house. However, the court determined that the search of Valles' locked room was unlawful, that the fruits of that search formed the basis for the search warrant, and that the good faith exception did not apply. Nevertheless, the court overruled Lowery's motion because he failed to prove that he had standing to challenge the search of Valles' locked room; the court found the evidence insufficient to show that Lowery was an overnight guest, but that even if he was an overnight guest, he had no expectation of privacy in Valles' locked room, which is where the contraband was found that formed the basis for the warrant.

At trial, Officer Catlin, Deputy Ojeda, and Chief Cotant testified. Their testimony was generally consistent with what they had testified to at the hearing on the motion to suppress, though Officer Catlin's testimony was geared toward other aspects of the investigation, such as obtaining the search warrant and the collection of evidence; Deputy Ojeda and Chief Cotant provided more of the background information. During Deputy Ojeda's testimony, Lowery objected on the grounds raised in his earlier motion to suppress, which objection was overruled, but Lowery was granted a continuing objection.

Lowery again objected during Officer Catlin's later testimony and added to his continuing objection the alleged insufficiency of the affidavit for the search warrant. Other officers testified regarding their involvement in the case, including the execution of the search warrant, the identification of the drugs, and the various indicia of drug distribution. Thereafter, the State rested.

Lowery then put on his defense, which consisted of the testimony of a friend, Lowery's brother, and Lowery. Lowery's brother testified that Valles was a friend of his and that Valles allowed Lowery to stay the night at his house. Lowery testified that he stayed the night at Valles' house the night of January 9, 2014, with Valles' permission. Lowery also testified that none of the contraband found at the house belonged to him. At no point during Lowery's case in chief did he renew his motion to suppress or ask the court to reconsider its earlier ruling.

The jury found Lowery guilty of possession with intent to distribute a controlled substance (methamphetamine). He was later sentenced to 36 to 60 months' imprisonment and given 193 days' credit for time served.

Lowery has timely appealed to this court.

## ASSIGNMENT OF ERROR

Lowery assigns that the trial court erred by failing to suppress evidence obtained during an unlawful search and seizure.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id*.

## ANALYSIS

*Arrest of Lowery in Third Party's Home Did Not*
*Violate Lowery's Fourth Amendment Rights.*

[2] Lowery argues that the evidence upon which he was convicted was the result of an unlawful search and seizure. He argues primarily that law enforcement unlawfully entered Valles' residence without a search warrant in their attempt to arrest Lowery pursuant to an arrest warrant. Lowery argues that in *Steagald v. United States*, 451 U.S. 204, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981), the U.S. Supreme Court held that absent exigent circumstances or consent, law enforcement officers may not legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant. Lowery argues that "by entering the Valles residence without a valid search warrant in order to search for [Lowery], law enforcement conducted an illegal search," and that "none of the relevant warrantless search exceptions are applicable in a manner that would cure the illegality of [the officers'] search." Brief for appellant at 18. However, in *Steagald*, the Court specifically stated that "the narrow issue before [the Court was] whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests *of persons not named in the warrant.*" 451 U.S. at 212 (emphasis supplied). As stated in *Steagald*, the interests protected by the two warrants differ; an arrest warrant "primarily serves to protect an individual from an unreasonable seizure," whereas a search warrant "safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." 451 U.S. at 213.

The Eighth Circuit, citing to *Steagald, supra*, for the proposition that "absent exigent circumstance or consent, an arrest warrant does not justify entry into a third person's home to search for the subject of the arrest warrant," stated that "[t]hus, 'if the suspect is just a guest of the third party, then the police must obtain a search warrant for the third party's dwelling in order to use evidence found *against the third party.*'" *U.S. v.*

*Risse*, 83 F.3d 212, 215, 216 (8th Cir. 1996) (emphasis supplied). *Risse* is similar to *Steagald* in that both were concerned only with the Fourth Amendment rights of the person not named in the arrest warrant. We have found no U.S. Supreme Court case addressing whether the subject of an arrest warrant has had his or her Fourth Amendment rights violated when law enforcement enters the home of a third party without first obtaining a search warrant in an attempt to execute a valid arrest warrant of the subject.

[3] As we explain below, according to the overwhelming majority of the case law, if a person is arrested pursuant to a valid arrest warrant, it does not matter whether the arrest occurs in his or her own home or in the home of another, as long as there is either reasonable belief or probable cause to believe that the subject of the arrest warrant is within the home; no search warrant, consent, or exigent circumstances are required in order to protect the Fourth Amendment rights of the subject of the arrest warrant. And because Lowery was arrested pursuant to a valid arrest warrant and there was probable cause to believe that he was in Valles' home, Lowery's Fourth Amendment rights were not violated when law enforcement entered Valles' home without a search warrant to arrest Lowery.

In his brief, Lowery also cites us to *State v. Gorup*, 279 Neb. 841, 782 N.W.2d 16 (2010), for the proposition that without a search warrant, police may only search for the subject of an arrest warrant in the home of a third party if a warrantless search exception applies; we do not read the *Gorup* opinion to say what Lowery claims. Rather, at issue in *Gorup* was the admissibility of evidence seized following law enforcement's entry into the defendant's apartment after his arrest outside the apartment, which was later followed by the defendant's consent to search the apartment. The discussion in *Gorup* on attenuation, or break in the causal connection between the illegal conduct and the consent to search, does not help us here.

A copy of Lowery's arrest warrant was received into evidence at the suppression hearing without objection; the warrant was for unpaid fines and court costs, and the underlying offenses were infractions. Although Lowery does not challenge the validity of the arrest warrant, we note that the arrest warrant was in fact valid. See *State v. Wenke*, 276 Neb. 901, 905-06, 758 N.W.2d 405, 409 (2008) ("[w]here an arrest is pursuant to a warrant . . . the validity of the arrest turns on whether the county court had probable cause to issue the arrest warrant. On its face, the warrant pursuant to which [defendant] was arrested affirmatively states facts giving rise to probable cause based upon the issuing judge's personal review of the court file. This is sufficient to establish probable cause").

Because there was a valid arrest warrant for Lowery, officers did not need a search warrant to arrest Lowery in Valles' home, regardless of whether Lowery enjoyed overnight guest status which would entitle him to a reasonable expectation of privacy in Valles' home. We now explain.

We begin by considering the well-established law regarding law enforcement's ability to enter the home of the subject of an arrest warrant. "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Although the holding in *Payton* occurred in the context of a felony arrest, other courts have extended the holding in *Payton* to permit entry into a suspect's residence to execute a valid arrest warrant, even when the underlying offense was not a felony. See *United States v. Spencer*, 684 F.2d 220 (2d Cir. 1982) (court's decision in *Payton* permits entry into residence to effectuate valid arrest warrant, regardless of precise nature of underlying warrant). See, also, *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984) ("[w]hen the government's

interest is only to arrest for a minor offense . . . the government usually should be allowed [to enter the home] to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate"); *U.S. v. Gooch*, 506 F.3d 1156 (9th Cir. 2007) (officers were justified in entering residence of suspect named in misdemeanor bench warrant for failure to appear); *U.S. v. Lloyd*, 396 F.3d 948 (8th Cir. 2005) (deputies were entitled to enter defendant's residence to execute misdemeanor arrest warrant for defendant); *State v. Borst*, 281 Neb. 217, 795 N.W.2d 262 (2011) (State was required to offer misdemeanor arrest warrants and affidavits into evidence in order for district court to determine whether officers had valid arrest warrants and therefore had legal right to be in defendant's home). As will be discussed further next, given law enforcement's authority to enter a suspect's own residence to execute a valid arrest warrant, courts have generally held that a suspect should expect no greater protection in a third party's residence.

Nearly every court of appeals to consider the issue has held that law enforcement officers do not need a search warrant in addition to an arrest warrant to enter a third party's residence in order to effect an arrest. See, *U.S. v. Hollis*, 780 F.3d 1064 (11th Cir. 2015); *U.S. v. Jackson*, 576 F.3d 465 (7th Cir. 2009); *U.S. v. McCarson*, 527 F.3d 170 (D.C. Cir. 2008); *U.S. v. Agnew*, 407 F.3d 193 (3d Cir. 2005); *U.S. v. Kaylor*, 877 F.2d 658 (8th Cir. 1989); *United States v. Underwood*, 717 F.2d 482 (9th Cir. 1983); *United States v. Buckner*, 717 F.2d 297 (6th Cir. 1983). But see, *U.S. v. Glover*, 746 F.3d 369 (8th Cir. 2014) (contradicting *Kaylor, supra*, which it still cites as precedent); *U.S. v. Weems*, 322 F.3d 18 (1st Cir. 2003) (assuming but not deciding that suspect can challenge search of third party's home incident to suspect's arrest). As stated by the 11th Circuit in *Hollis*, 780 F.3d at 1068, quoting *Agnew, supra*:

"A person has no greater right of privacy in another's home than in his own. If an arrest warrant and reason to

> believe the person named in the warrant is present are sufficient to protect that person's [F]ourth [A]mendment privacy rights in his own home, they necessarily suffice to protect his privacy rights in the home of another."

In the instant case, there was a valid arrest warrant for Lowery, and therefore, the officers did not need a search warrant to arrest Lowery in Valles' home. We want to be clear that we are concerned only with Lowery (the subject of the arrest warrant) and whether his Fourth Amendment rights were violated; we do not address whether the rights of any third party were violated when law enforcement entered Valles' home without a search warrant to arrest Lowery.

Although officers do not need a search warrant to execute an arrest warrant in a third party's home, they do need some basis for believing that the suspect is actually present in the home. *Jackson, supra*. The *Jackson* court noted the split among the circuits as to what level of suspicion officers need in order to enter a home to execute an arrest warrant.

> In *Payton* [*v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)], the Supreme Court held that an arrest warrant "carries with it the limited authority to enter a dwelling when there is *reason to believe* the suspect is within." 445 U.S. at 602, 100 S.Ct. 1371 (emphasis added).

> Our sister circuits disagree about what "reasonable belief" actually entails and whether its meaning is different from probable cause. By our count, three circuits have explicitly concluded that reasonable belief requires a lesser degree of knowledge than probable cause. *See United States v. Thomas*, 429 F.3d 282, 286 (D.C.Cir.2005); *Valdez v. McPheters*, 172 F.3d 1220, 1227 n. 5 (10th Cir.1999); *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir.1995). The courts in these cases conclude that the Supreme Court "used a phrase other than 'probable cause' because it meant something other than 'probable cause.'" *Thomas*, 429 F.3d at 286.

Four other circuits have disagreed, holding that "reasonable belief" amounts to the same thing as "probable cause." *See United States v. Hardin*, 539 F.3d 404, 416 n. 6 (6th Cir.2008); *United States v. Barrera*, 464 F.3d 496, 501 (5th Cir.2006); *United States v. Gorman*, 314 F.3d 1105, 1111 (9th Cir.2002); *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir.1995). As Judge Clay explained in a concurring opinion, the Supreme Court tends to use phrases like "reasonable grounds for belief" as "grammatical analogue[s]" for probable cause. *United States v. Pruitt*, 458 F.3d 477, 490 (6th Cir.2006) (Clay, J., concurring) (citing cases). To wit, in *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), the Court appears to use "reasonable belief" to *define* probable cause. *Id.* at 371, 124 S.Ct. 795 ("[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt.").

*U.S. v. Jackson*, 576 F.3d 465, 468-69 (7th Cir. 2009). The *Jackson* court said that if it had to reach the issue, it "might be inclined to adopt the view of the narrow majority . . . that 'reasonable belief' is synonymous with probable cause." 576 F.3d at 469. However, the *Jackson* court stated that it did not need to decide the issue, because in the case before it the police had enough evidence to satisfy a probable cause standard.

Similarly, we need not decide whether reasonable belief requires probable cause or something less, because in the instant case, officers had probable cause to believe that Lowery was in Valles' home. Officer Catlin observed Lowery's Chevy parked on the street in front of Valles' home. Officers informed Valles and his wife that they were looking for Lowery and asked if he was in the house; both Valles and his wife stated that they did not know if Lowery was in the house, and in fact, Valles told officers that no one was in the house except for himself, his wife, and their child (whom his wife was holding). While speaking with Valles and his wife, officers behind the house radioed that they had seen someone peeking

through the shades in the back room of the house. Given the circumstances, the officers had probable cause to believe that Lowery was in Valles' home. Because officers had a valid warrant to arrest Lowery and probable cause to believe he was in Valles' residence, the officers could enter Valles' residence to arrest Lowery. The arrest of Lowery in Valles' residence did not violate Lowery's Fourth Amendment rights. Again, we want to be clear that we are concerned only with Lowery and whether his Fourth Amendment rights were violated; we do not address whether the rights of any third party were violated when law enforcement entered Valles' home without a search warrant to arrest Lowery.

*Lowery Did Not Have Standing to Challenge Search of Valles' Locked Room.*

Lowery also argues that because of his status as an overnight guest, he has standing to challenge the alleged invalid search of Valles' residence. In its brief, the State points out that Lowery relies in large part on his testimony at trial to argue that the district court erred in concluding that he was not an overnight guest and did not have standing to challenge the searches under the Fourth Amendment. But, the State notes that Lowery's trial testimony was not available to the district court when it overruled Lowery's motion to suppress, and after Lowery's testimony was adduced at trial, he "did not renew his motion to suppress, ask the court to reconsider its earlier ruling, or otherwise alert the court that there was new evidence regarding whether Lowery was an overnight guest." Brief for appellee at 13.

The State acknowledges the general rule that "'[w]hen a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.'" *Id.* Accord *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015). But the State then argues that "it is difficult to see how the court could have erred based on evidence that was

never presented to it for disposition." Brief for appellee at 13. The State submits that if Lowery's testimony were excluded from consideration, "the district court's finding that Lowery was not an overnight guest would not be clearly wrong, which would mean that Lowery did not have standing to challenge the searches and that the court properly overruled his motion to suppress on that ground." Brief for appellee at 14.

We need not decide whether Lowery's trial testimony regarding his overnight status should be excluded from consideration, because the arrest of Lowery in Valles' home did not violate Lowery's Fourth Amendment rights. As will become apparent later in our analysis, even if Lowery did have overnight guest status, he did not have standing to challenge the initial search of Valles' locked room. The search of the locked room led to a search warrant for the rest of the home, at which time the evidence used against Lowery was discovered. The fact that the room was locked and not accessible to Lowery is key to Lowery's inability to challenge the search.

[4] In *State v. Nelson*, 282 Neb. 767, 776, 807 N.W.2d 769, 778 (2011), the Nebraska Supreme Court said:

Although the right to challenge a search on Fourth Amendment grounds is generally referred to as "standing," the U.S. Supreme Court has clarified that the definition of that right "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Rakas* [*v. Illinois*, 439 U.S. 128, 140, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)]. See *Minnesota v. Carter*, 525 U.S. 83, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998). We have stated: "A 'standing' analysis in the context of search and seizure is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment." *State v. Konfrst*, 251 Neb. 214, 224, 556 N.W.2d 250, 259 (1996). As the Court of Appeals for the Fifth Circuit has stated, and we tend to follow: "We [nevertheless] use the term

'standing' somewhat imprecisely to refer to this threshold substantive determination." *U.S. v. Sanchez*, 943 F.2d 110, 113 n.1 (1st Cir. 1991).

Like the court in *Nelson, supra*, we will use the term "standing" in our analysis as well.

[5] A "standing" analysis in the context of search and seizure is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment. *Nelson, supra*. The test used to determine if a defendant has an interest protected by the Fourth Amendment is whether the defendant has a legitimate or justifiable expectation of privacy in the premises. See *id*. Ordinarily, two inquiries are required: First, an individual must have exhibited an actual (subjective) expectation of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable. *Id*.

[6,7] In *State v. Lara*, 258 Neb. 996, 1001, 607 N.W.2d 487, 491 (2000), the Nebraska Supreme Court said:

The U.S. Supreme Court has held that an individual's status as an overnight guest is enough alone to show that he or she has a legitimate expectation of privacy in the premises which is protected by the Fourth Amendment. *Minnesota v. Olson*, 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). Likewise, this court has recognized that an overnight guest has an expectation of privacy in his or her host's home, which society is willing to recognize as reasonable, and, therefore, the overnight guest has standing to assert Fourth Amendment violations. *State v. Conklin*, 249 Neb. 727, 545 N.W.2d 101 (1996); *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995); *State v. Cortis*, 237 Neb. 97, 465 N.W.2d 132 (1991); *State v. Walker*, 236 Neb. 155, 459 N.W.2d 527 (1990).

Importantly, however, an overnight guest's legitimate expectation of privacy does not extend to areas of the host's home which are off limits to the guest or of which the guest has

no knowledge. *U.S. v. Osorio*, 949 F.2d 38 (2d Cir. 1991); *Lara, supra*.

Based on these principles, even if Lowery was an overnight guest at Valles' home, Lowery did not have a legitimate expectation of privacy in Valles' locked bedroom; Valles told the officers that it was his room, he always kept it locked, and nobody ever went in there. Accordingly, Lowery did not have standing to challenge the search of Valles' locked room.

The search of Valles' locked room revealed drug paraphernalia and formed the basis for the search warrant; the search warrant was then used to search the entire home, including the bedroom that Lowery had been in. As we will explain below, any illegal search of Valles' locked room did not violate Lowery's Fourth Amendment rights, and thus, he does not have standing to challenge such search and the fruit of the poisonous tree doctrine does not apply. Accordingly, evidence found in Valles' home, including the bedroom Lowery had been in, was admissible against Lowery.

[8] "[A] defendant . . . can prevail on a 'fruit of the poisonous tree' claim only if he has standing regarding the violation which constitutes the poisonous tree." 6 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 11.4 at 324-25 (5th ed. 2012). LaFave said:

> A useful illustration is *People v. Henley*, [53 N.Y.2d 403, 425 N.E.2d 816, 442 N.Y.S.2d 428 (1981)], where after his illegal arrest defendant consented to search of an apartment he shared with his brother, resulting in the discovery of the fruits of a burglary. The evidence was suppressed as to the defendant because the consent, though voluntary, was the fruit of his illegal arrest, but the brother did not likewise prevail, as the illegal arrest was not a violation of his constitutional rights.

6 LaFave, *supra*, § 11.4 at 325.

Also instructive is *Alderman v. United States*, 394 U.S. 165, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969). In *Alderman*, the question was the defendants' (there were three separate

defendants involved) standing to object to the government's use of the fruits of illegal surveillance. Each defendant asked for a retrial if any of the evidence used to convict him was the product of unauthorized surveillance, regardless of whose Fourth Amendment rights the surveillance violated. The Supreme Court rejected the defendants' "expansive reading" of the Fourth Amendment and of the exclusionary rule stating: "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman*, 394 U.S. at 171-72. The *Alderman* Court adhered to "the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Id.*, 394 U.S. at 174. The Court said that "there is a substantial difference for constitutional purposes between preventing the incrimination of a defendant through the very evidence illegally seized from him and suppressing evidence on the motion of a party who cannot claim this predicate for exclusion." *Id.* But see, La. Const. Ann. art. 1, § 5 (2006) (stating in relevant part "[a]ny person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court").

In the instant case, the search warrant and the items found in the subsequent search of the entire house, including the bedroom Lowery had been in, were the fruit of the prior search of Valles' locked bedroom. An argument could be made that the search of that locked room was illegal, because the officers forced Valles to unlock the door and had no probable cause or other reasonable belief that Lowery's brother was in there. In other words, the initial search of Valles' locked room is the "poisonous tree" in this case. Lowery did not have standing to challenge the search of Valles' locked room, because even if Lowery qualified as an overnight guest in Valles' home entitling him to an expectation of privacy in his host's home,

an overnight guest's legitimate expectation of privacy does not extend to areas of the host's home which are off limits to the guest or of which the guest has no knowledge. *State v. Lara*, 258 Neb. 996, 607 N.W.2d 487 (2000). Therefore, the possible illegal search of Valles' locked bedroom did not violate Lowery's constitutional rights. Though the search of Valles' bedroom was arguably unconstitutional as to Valles, Lowery, as a third party, does not have standing to complain about a violation of another party's constitutional rights. See, *Alderman, supra*; *People v. Henley*, 53 N.Y.2d 403, 425 N.E.2d 816, 442 N.Y.S.2d 428 (1981). See, also, *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) ("since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment . . . it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections"). Therefore, Lowery cannot prevail on his fruit of the poisonous tree doctrine claim, because he did not have standing regarding the search that constituted the poisonous tree (the initial search of Valles' locked room). Accordingly, evidence found in Valles' home, including the bedroom Lowery had been in, was admissible against Lowery.

## CONCLUSION

For the reasons stated above, the arrest of Lowery in Valles' home did not violate Lowery's Fourth Amendment rights, and even if Lowery did have overnight guest status, he did not have standing to challenge the search of Valles' locked room. Accordingly, we affirm the district court's denial of Lowery's motion to suppress.

AFFIRMED.