2022 IL App (2d) 200230-U
No. 2-20-0230
Order filed January 7, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Carroll County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) ) | Nos. 19-CF-80 19-CF-81 19-CM-134 |
| MICHAEL J. DENSON, | ) ) ) | Honorable Val Gunnarsson |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hudson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's jury instructions did not constitute plain error, because either there was no error or the error was harmless. In addition, because no prejudicial error occurred, defense counsel was not ineffective for failing to object to the instructions or preserve the issues for review. Therefore, we affirm.

¶ 2    At issue in this appeal is whether two of the trial court's jury instructions constituted plain error and whether defense counsel provided ineffective assistance in failing to object to the instructions or preserve them via a posttrial motion. For the reasons provided herein, we hold that the State's non-Illinois Pattern Jury Instructions did not misstate the law and therefore did not

constitute a clear error. Although the trial court erroneously omitted language from Illinois Pattern Jury Instructions, Criminal, No. 24-25.12 (hereinafter IPI Criminal No. 24-25.12) and failed to give Illinois Pattern Jury Instructions, Criminal, No. 24-25.15 (hereinafter IPI Criminal No. 24-25.15), those errors were harmless. Accordingly, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     Defendant, Michael J. Denson, was charged with the following three counts: (1) resisting or obstructing a peace officer (720 ILCS 5/31-1(a) (West 2018) (Class A Misdemeanor)), in that he knowingly refused to allow officers to secure him in handcuffs during a physical altercation; (2) concealing or aiding a fugitive (720 ILCS 5/31-5 (West 2018) (Class 4 Felony)), in that he harbored Nathan Green, who had an outstanding warrant for his arrest; and (3) aggravated battery of a peace officer (720 ILCS 5/12-3.05(d)(4) (West 2018) (Class 2 Felony)), in that he tackled Officer Courtney Grinnall to the ground.

¶ 5                                     A. Trial Testimony

¶ 6     Defendant's jury trial occurred on January 22, 2020. Grinnall testified for the State as follows. On October 2, 2019, he was working as a police officer for the City of Savanna on the 6 p.m. to 6 a.m. shift, and he was dressed in his patrol uniform. Between 9 and 10 p.m., he was in a marked squad car when he recognized Nathan Green in the driver's seat of another vehicle. Grinnall confirmed with dispatch that Green had an active warrant out for his arrest. The warrant was from Clinton County, Iowa, for possession of a controlled substance. Grinnall did not have any reports indicating that Green was violent. He observed Green exit the vehicle, walk up steps to the upper level of a residential building, and enter an apartment. After observing Green enter the apartment, he informed dispatch that he would be out at the location attempting contact.

¶ 7    Grinnall approached the building before Lieutenant Nicholas Meeker arrived in response to his call to dispatch. When Grinnall arrived at the door, no one was outside. He knocked on the door and announced his presence, declaring that he was Savanna Police. Shortly thereafter, defendant opened the door, with the door opening inwards toward defendant. Defendant did not step outside. Grinnall advised him to send Green outside because he had a warrant for him. Defendant did not do so, and he shut the door.

¶ 8    Grinnall attempted to open the door, but it was locked. At some point after the door was shut, Meeker joined him. Grinnall began knocking on the door repeatedly, calling out to defendant and Green. He advised defendant that Green needed to be sent outside, and he asked defendant to open the door. Green never came out.

¶ 9    Grinnall then informed the occupants that entry would be made and that if defendant failed to comply, he would also be arrested for concealing a fugitive. He heard a reply from defendant that the police needed a warrant and asked if they had a warrant. He also heard a dog barking inside. He stated that the dog needed to be secured because if the current situation continued, he would be forcing entry.

¶ 10   Defendant responded that he would not lock the dog up and that if the officers entered, the dog would bite them. Grinnall and Meeker made multiple requests for defendant to secure the dog.

¶ 11   Approximately four minutes after Grinnall initially arrived at the door, he and Meeker attempted to force entry into the residence. Grinnall began by kicking the door. After a few kicks, the door budged open but was immediately slammed shut. He and Meeker worked together to overcome the resistance from the other side of the door, and after about another minute, they were able to open the door.

¶ 12    With the door open, Grinnall observed defendant laying on the floor, "knocked back onto his butt." He also saw a woman further back in the residence, who was later identified as Kimberly Lane. Only defendant was in the immediate proximity of the door. To Grinnall's right was the dog, approximately five feet away, and it was barking and baring its teeth. He identified the dog as a Pitbull or Pitbull mix, and the dog was unrestrained.

¶ 13    The dog charged. Grinnall fired his weapon at the dog because he believed the dog was going to bite him or Meeker, and the dog stopped. Defendant then "attacked" him. Defendant "jumped onto [his] head," grabbed his neck, and forced him downwards. Grinnall was knocked back outside of the apartment, falling on the landing right outside the door. Defendant had a hold of his head, with his arm wrapped around it, and Grinnall felt something hard pressed against his back right ear. He later determined that the object pressed against him was a pocketknife. On cross-examination, he acknowledged that the pocketknife recovered at the scene was closed and that he did not have personal knowledge of whose knife it was.

¶ 14    Grinnall did not remember any statements he made or whether he was able to verbalize any commands while defendant was on him. He was concerned with keeping his firearm back until it could be properly secured, and he was in a lot of pain. He was not sure how long defendant was on him, but it felt like "forever." Meeker was able to pull defendant off him. Once defendant was off, Grinnall noticed that his contact lenses had fallen out.

¶ 15    After defendant was placed in custody, Grinnall was transported by ambulance to a hospital in Iowa, where he received treatment. He went on light duty at work, and he was unable to move his neck correctly. He returned to patrol duty after about a week.

¶ 16    Meeker testified as follows, largely consistent with Grinnall's testimony. On October 12, 2019, he was working for the Savanna Police Department, when around 9:19 p.m., he was

requested to assist at the residence that Grinnall observed Green enter. He arrived about a minute later and observed Grinnall, dressed in uniform, at the top steps of a duplex. Grinnall was knocking on the door and announcing that he was the police and that he was there to arrest Green. When he joined Grinnall, Meeker personally announced "ten to twelve times" that they were the police, they had an arrest warrant, and that the occupants needed to come to the door or else they would make entry into the residence. Meeker also heard a dog barking and requested that the occupants secure the dog.

¶ 17    After Grinnall kicked the door open, Meeker could see into the apartment. He saw Lane and Green, and then he saw defendant, who shoved the door closed. He and Grinnall pushed the door back open, and he observed defendant on the floor behind the door. He did not see Lane or Green right away after reopening the door, and he heard a dog barking from somewhere within. Grinnall entered first, and as he crossed the threshold, Meeker heard a single gunshot. Grinnall then came outside backwards, and he fell down with defendant on top of him. Defendant was putting pressure on the back of Grinnall's neck. Meeker was attempting to call for emergency assistance, because at the time, he did not know where the shot came from or who was hit. He commanded defendant to stop and get off Grinnall, but he did not comply.

¶ 18    Meeker then physically separated them, pushing defendant back into the residence. Defendant immediately tried to get back up, so Meeker drew his taser and fired at defendant's back. Although defendant had not got back up fully before he fired, Meeker believed that there was going to be a continuation of the attack if he was not subdued. The taser stopped defendant, and thereafter he complied with instructions. They took Green into custody first, and he waited for additional backup before taking defendant into custody.

¶ 19    Kimberly Lane testified on behalf of defendant as follows. Defendant was her son, and Green was her ex-boyfriend. On October 12, 2019, she was staying at the apartment the police entered; it was not her apartment. The apartment was Kim McColley's, and the plan had been to move in with her and split the cost as roommates. Defendant would come over to the apartment and stay with her sometimes, but other times he stayed at friends' houses.

¶ 20    They had a dog named Trixy, and she described Trixy as a mix of a Great Dane, Lab, and "maybe a couple of other things." Trixy was defendant's dog, but defendant often stayed elsewhere with friends. Trixy was four years old at the time of the incident, and she weighed 65 pounds when taken to the veterinarian after being shot. Trixy survived and was doing fine at the time of trial. Lane described Trixy as a "very loving dog" and well-trained.

¶ 21    Shortly after she and Green returned to the apartment on October 12, she heard police knocking at the front door. She knew they were from the Savanna Police Department because they announced themselves, and they were asking them to open the door. The police did not immediately say why they needed the door open. She heard defendant ask the police for a warrant, and the police explained that they did not need one. They never asked for Green to come out; they demanded only that the door be opened.

¶ 22    After a minute, Lane ascertained that the police were there for Green. She previously had been unaware that he had a warrant out for his arrest. Defendant told the police to hold on a minute, that they were upsetting the dog, and that he wanted to put the dog away in the bedroom. Trixy did not growl at the police that day, but she was barking.

¶ 23    Lane then approached the door to unlock it. As she was trying to unlock it, the officers kicked the door, and it made her jump back and scream. Defendant came running to see what was going on, and in doing so he did not completely close the bedroom door. He moved to unlock the

door, and as he turned the knob, the officers kicked again, sending the door into defendant. He was knocked back and hit the floor. Lane saw Trixy in the living room and went to her.

¶ 24    Grinnall entered the door with his gun drawn, and he fired. Lane was about five feet away from Grinnall when he discharged his weapon, and defendant was about a foot away from him when he fired. The gun was aimed in the direction of her and Trixy. After the shot, Trixy yelped and barked, and Lane noticed that the dog was bleeding. Lane denied that she or anyone else had said Trixy would bite the officers if they entered the apartment. She had never sicced Trixy on anyone before.

¶ 25    She heard a scream and a commotion, and defendant had gone towards Grinnall. She saw defendant push him back, and they were briefly outside the apartment. Defendant was then pushed back into the house, and he was tased. Defendant did not resist being handcuffed.

¶ 26    The last witness was defendant, who testified as follows. Lane was his mother, and as of October 12, 2019, he was 21 years old and "living here and there." He stayed with Lane on occasion, and he also stayed with friends at their houses. On October 12, he had been planning to stay at his mother's apartment. Prior to 9 p.m., he was there alone. Lane returned home sometime after 9 p.m., and she brought Trixy home with her. Defendant described Trixy as a Great Dane/Lab mix and approximately 60 pounds. She had never bitten anyone, and he personally had given her some obedience training.  He denied ever telling the police that Trixy would bite them if they came in.

¶ 27    Defendant was on the couch facing away from the door, so he did not know that Green had also arrived after Lane. Sometime after Lane arrived at the apartment, defendant heard knocking at the door. Grinnall announced himself, but he did not say at first why he was there. Defendant opened the door to ask him why he was there, and Grinnall responded that he had a warrant for

Green. Grinnall was in full police uniform, and defendant understood he was there in his official capacity.

¶ 28    Defendant then shut and locked the door via a deadbolt, and he walked away from the door. Trixy was barking because someone was at the door. He went to secure her because Grinnall said he was going to come in whether he "liked it or not," and this was when he realized Green was in the apartment. He denied that the police asked him to secure the dog. He put Trixy in a side room, but while doing so he heard a yell, and he returned to the main room without pulling the door shut all the way.

¶ 29    Defendant returned to find the officers kicking the door. As he was attempting to unlock the door, it came open and hit him, knocking him to the floor. Grinnall entered with his gun drawn. His gun was first pointed at defendant, and then it went toward Trixy. Defendant saw a flash, and then Grinnall started coming toward him, which made him afraid. Defendant did not see him shoot Trixy, but the flash "almost blinded" him and his ears were ringing.

¶ 30    Defendant advanced on Grinnall, throwing his arm up and wrapping his arms around Grinnall's upper neck and head area in an effort to subdue him. He did not hear Meeker command him to let go of Grinnall, as his ears were ringing from the gunshot. After that, it was a "pretty big haze." Grinnall fell, but defendant did not let go. The next thing he remembered was being tased, and after that everything "went fuzzy" and he was unable to move.

¶ 31                                    B. Jury Instructions

¶ 32    Following the conclusion of witness testimony, the trial court conducted a jury instruction conference. The State tendered several instructions, most of which were given without objection. Defense counsel objected to Illinois Pattern Jury Instructions, Criminal, No. 11.16 (approved April

26, 2016) (hereinafter IPI Criminal No. 11.16),[1] arguing that the facts justified giving the self-defense instruction. The trial court stated that if this had been a bench trial, he would not have given defendant's testimony credence that he feared the officers, but defendant was entitled to have the jury instruction on any theory supported by any amount of evidence. Therefore, the State's instruction was refused. The State then presented an alternative IPI Criminal No. 11.16, which was given without objection. The given instruction included the original instruction's three propositions required to prove aggravated battery to a peace officer and added a fourth proposition that the State must prove that defendant was not justified in using the force he used.

¶ 33    The State's 16th instruction was a non-IPI instruction (People's 16) derived from *People v. Sain*, 122 Ill. App. 3d 646 (1984). It provided that "[a]n officer executing an arrest warrant is authorized to enter a building where the person is or is reasonably believed to be if he is refused admittance after announcing his authority and purpose." Defense counsel initially objected, and the trial court interjected that it believed the instruction was "clearly the law," after which counsel withdrew an objection. The trial court explained that although the apartment was not Green's residence, this was a "hot pursuit case."

¶ 34    The State also tendered an instruction based on IPI Criminal No. 24-25.12 (People's 18), which provided that:

---

[1] The instruction provided that, for the offense of aggravated battery to a police officer, the State had to prove three propositions: (1) that defendant knowingly made physical contact of an insulting or provoking nature with Grinnall; (2) that defendant knew Grinnall was a peace officer; and (3) that defendant knew Grinnall was engaged in the execution of his official duties.

"A police officer need not retreat or desist from effort to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he believes to be necessary to effect the arrest or defend himself from bodily harm while making the arrest."

Defense counsel objected, asking that the additional parenthetical language of IPI Criminal No. 24-25.12 be given that an officer is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or another. The trial court did not believe that there was a question of whether Grinnall applied deadly force to anybody, and therefore it gave the State's instruction as written.

¶ 35     Defense counsel tendered one instruction, Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (hereinafter IPI Criminal No. 24-25.06), on use of force in defense of a person. It provided that "[a] person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against the imminent use of unlawful force." The instruction was given without objection.

¶ 36     In instructing the jury, the trial court provided People's 18 in relation to the offense of aggravated battery of a peace officer. Regarding the offense of concealing or aiding a fugitive, the trial court provided People's 16.

¶ 37     The jury returned guilty verdicts on all three counts. Defendant was sentenced to three years' imprisonment for aggravated battery of a peace officer, which was to be served concurrently with his 3-year sentence for concealing a fugitive. For resisting or obstructing a peace officer, he received 159 days with credit for 159 days served.

¶ 38     This timely appeal followed.

¶ 39                                    II. ANALYSIS

¶ 40    At issue in this appeal is whether the trial court committed plain error in instructing the jury, and whether defense counsel provided ineffective assistance in failing to object to People's 16 and failing to file a posttrial motion preserving instructional errors related to People's 16 and 18. Defendant contends that the instructional errors, individually and cumulatively, were plain error under both prongs on plain error, in that the evidence was closely balanced and the errors deprived him of a fair trial. We review his claims of instructional error in turn.

¶ 41                          A. Non-IPI Jury Instruction

¶ 42    Defendant argues that People's 16 misstated the law and therefore was a clear and obvious error for purposes of plain error. Specifically, relying on *Steagald v. United States*, 451 U.S. 204 (1981), defendant argues that officers are required under the fourth amendment of the United States Constitution to obtain a search warrant to arrest a person in the home of a third person. He contends that he was a part-time resident at the apartment because he lived there "on and off for some time," and that the trial court acknowledged that he was a part-time resident. Further, he argues that Green was not a resident of the apartment.

¶ 43    Defendant continues that *Sain*, 122 Ill. App. 3d at 646, did not authorize the non-IPI instruction. He argues that *Sain*, as well as *Steagald*, permit an officer to enter a suspect's *own* residence to arrest the suspect pursuant to an arrest warrant for that suspect, but they do not permit entering the residence of a third party absent a search warrant. He concludes that because the jury instruction did not reflect applicable fourth amendment law, error occurred under both *Steagald* and *Sain*.

¶ 44    In addition, defendant argues that the hot pursuit exception to a warrant requirement did not apply. He argues that under the hot pursuit exception, police may enter a private residence without a warrant to arrest a fleeing subject, but that the arrest had to have been initiated in a public

place. He argues that here, the police did not speak to or contact Green before he entered the apartment, and therefore Green was not fleeing them and the exception did not apply. Lastly, defendant argues that the consent exception to a warrant requirement did not apply, because he unquestionably did not consent to Grinnall and Meeker's entry into the apartment.

¶ 45    The State responds that People's 16 accurately conveyed the law to the jury. It argues that unlike the agents in *Steagald*, who were acting on a hunch that the suspect would be at the residence they entered, Grinnall actually observed Green enter the apartment. Thus, the officers did not have a mere suspicion or hunch that Green was present within but instead had actual knowledge. Furthermore, Grinnall announced that he was from the Savanna Police Department and that he had a warrant for Green, yet defendant refused to let the officers come inside or send Green outside.

¶ 46    Because trial counsel did not raise the constitutional issue below, our review is for plain error. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1970) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). The first step in a plain error analysis is to determine whether a clear or obvious error occurred. *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). If we find that there was an unpreserved error, then defendant must demonstrate either (1) that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him, or (2) that the error was so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. If the defendant carries their burden under the first prong, prejudice is not presumed but instead the error is actually prejudicial. *Id.* ¶ 51. If the defendant carries their burden under the second prong, prejudice is presumed because of the importance of the right involved. *Id.* ¶ 50.

¶ 47    In *Steagald*, the "narrow issue" was "whether an arrest warrant—as opposed to a search warrant—is adequate to protect the fourth amendment interests of persons *not named in the warrant*, when their homes are searched without their consent and in the absence of exigent circumstances." (Emphasis added.) *Id.* at 212. The Supreme Court answered in the negative, concluding that in the absence of exigent circumstances or consent, officers must obtain a search warrant. *Id.* at 205-06. The facts of the case were as follows. A confidential informant contacted a Drug Enforcement Agency (DEA) agent with information on locating a federal fugitive, who was wanted on drug charges and was subject to a 6-moth-old arrest warrant. *Id.* at 206. DEA agents followed up on the information, driving to the address associated with the information received. *Id.* They approached the house with guns drawn, and they frisked two men outside, one of whom was the petitioner Gary Steagald, and neither of whom were the fugitive. *Id.* A woman answered the door, and agents guarded her while one agent searched the home. *Id.* The agent did not find the fugitive but did observe what he believed to be cocaine. *Id.*

¶ 48    The Court began its reasoning confirming that for purposes of the appeal, Steagald had a legitimate expectation of privacy in the home searched. *Id.* at 211. The Court then explained that the purposes of an arrest warrant and a search warrant are different: an arrest warrant is issued upon probable cause that the subject committed an offense, protecting the individual from an unreasonable seizure, whereas a search warrant is issued upon probable cause that the legitimate object of interest is located in a particular place, safeguarding an individual's interest in privacy against an unreasonable search of their home. *Id.* at 212-13.

¶ 49    The Court continued that, while the arrest warrant protected the fugitive against an unreasonable seizure, it did nothing to protect Steagald's legitimate privacy interest to be free of an unreasonable search of the home. *Id.* at 213. The Court recounted that, in the absence of exigent

circumstances, it had consistently held that judicially untested determinations of probable cause were not reliable enough to justify entry into a person's home to arrest them without a warrant or to search a home in the absence of a search warrant. *Id.* It found no reason to conclude differently when the search of a home was for a person rather than an object.

¶ 50    The *Steagald* Court recognized an instance in which an arrest warrant would permit entry absent a search warrant: when an officer enters *the suspect's home* to effect the suspect's arrest. *Id.* at 214 n.7 (citing *Payton v. New York*, 445 U.S. 573, (1980)). In *Payton*, the Court concluded that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603. The *Steagald* Court explained that the *Payton* rationale was inapplicable when police seek to use an arrest warrant to enter the home of a third party to conduct a search. *Steagald*, 451 U.S. at 214 n.7.

¶ 51    The facts and holding of *People v. Sain*, 122 Ill. App. 3d at 646, are consistent with *Payton* in that the officers entered the defendant's home—not the home of a third party—pursuant to an arrest warrant. Therefore, *Sain* does not illuminate whether an arrest warrant alone allows entry into a third party's home. The *Sain* court cited several other Illinois cases to support that officers may enter a building in which the person to be arrested is or is reasonably believed to be, but those cases again concern officers entering the defendant's own property. See *People v. Srovieri*, 43 Ill. 2d 223, 227 (1969) (the officers were permitted to enter the defendant's garage); *People v. Barbee*, 25 Ill. 2d 407, 412 (1966) (the officers did not violate the fourth amendment when they entered defendant's home and garage); *People. v. Stibal*, 56 Ill. App. 3d 1048, 1051-52 (1978) (the defendant's arrest warrant permitted officers to enter the defendant's home).

¶ 52    The question thus remains whether, under the fourth amendment, an officer may enter the home of a third party to effect an arrest warrant. The Seventh Circuit has answered this question affirmatively in *United States v. Jackson*, 576 F.3d 465 (7th Cir. 2009). There, the police had received an anonymous tip that the defendant had been staying at his father's girlfriend's apartment and that he would be there the next day in the morning. *Id.* at 467. The officers arrived the next morning, entered the apartment, and arrested the defendant. *Id.*

¶ 53    The *Jackson* court rejected the defendant's argument that police needed both a search warrant and arrest warrant to enter the apartment to arrest him. *Id.* The court explained that *Steagald* had addressed the narrow issue of whether an arrest warrant alone was adequate to protect the fourth amendment interests of *persons not named in the warrant. Id.* at 468. Thus, if officers enter a third party's residence to effect an arrest, that third party may have a fourth amendment claim against the officers. *Id.* It continued that *Steagald* did not hold that the subject of an arrest warrant had a greater expectation of privacy in another home than in their own. *Id.* The court then cited several other circuits to show broad agreement that officers do not need a search warrant in addition to an arrest warrant to effect an arrest warrant in a third party's residence. See *United States v. Agnew*, 407 F.3d 193, 197 (3d Cir. 2005) (the officers did not violate the fourth amendment when arresting the defendant pursuant to an arrest warrant even if he was a non-resident); *United States v. Kaylor*, 877 F.2d 658, 663 (8th Cir.1989) (the defendant's arrest warrant and the officer's reasonable belief of the defendant's presence justified entry into another's home without a search warrant); *United States v. Underwood*, 717 F.2d 482, 483-84 (9th Cir. 1983) ("A person has no greater right of privacy in another's home than in his own."); *United States v. Buckner*, 717 F.2d 297, 299-300 (6th Cir. 1983) ("The fact that the entry may have violated the

constitutional rights of the third party homeowner would have no effect on the defendant's criminal conviction.").

¶ 54    In permitting officers to enter a third-party residence to effect an arrest warrant, the *Jackson* court astutely disentangled the fourth amendment rights of residents and arrestees. The court cautioned, however, that although officers do not need a search warrant to execute an arrest warrant in a third party's home, they do need some basis for believing the suspect is present at the home. *Jackson*, 576 F.3d at 468.

¶ 55    Here, there is no dispute, under any standard of reasonable belief, that Grinnall had reason to believe that Green was in the apartment. He saw and recognized Green outside the apartment and then observed him walk into the apartment. He confirmed via dispatch that Green had an active warrant out for his arrest, and there was testimony that the officers announced their presence and purpose to arrest Green pursuant to a warrant. Under these facts, the fourth amendment would not proscribe the State's jury instruction.[2]

¶ 56    Accordingly, People's 16 did not misstate the law: *Steagald* does not prohibit an officer executing an arrest warrant from entering a building where the person to be arrested is or is reasonably believed to be when the officer is refused admittance after announcing their authority

---

[2] As an aside, we note that this was not a hot pursuit case. See *People v. Harrison*, 2016 IL App (5th) 150048, ¶ 17 (exigent circumstances include the need to render emergency assistance, the "hot pursuit of a fleeing suspect," and the need to prevent imminent destruction of evidence). That is, the officers did not attempt to effectuate Green's arrest in a public space before Green entered the apartment. See *People v. Smock*, 2018 IL App (5th) 140449, ¶ 26 (citing *United States v. Santana*, 427 U.S. 38, 42 (1976)).

and purpose. Whether the officers' entry violated *defendant's* fourth amendment rights is a separate issue not before us, and we express no opinion on that issue. The narrow issue before us was simply whether People's 16 accurately stated the law, and it did. Under the facts of this case, Green's arrest warrant permitted the officers to enter the apartment to execute the warrant. As the jury instruction did not constitute error, we need not proceed further with the plain error analysis. Furthermore, because the instruction was not given in error, there is no basis to say that defense counsel was ineffective for failing to object to the instruction or preserve it for review. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14 (a claim for ineffective assistance of counsel requires showing both deficient performance and prejudice to the defendant).

¶ 57                              B. IPI Jury Instructions

¶ 58     Defendant next argues that the trial court committed instructional error in giving the jury People's 18. He argues that the State's instruction deviated from the IPI Criminal No. 24-25.12 by omitting the word "reasonably" in relation to a peace officer's belief in the use of force necessary to effect an arrest. He argues that, therefore, the jury was improperly instructed that Grinnall and Meeker could use *any* force, including unreasonable misconduct, to make the arrest.

¶ 59     Moreover, he argues that the trial court should have granted defense counsel's request to add the additional bracketed language of IPI Criminal 24-25.12 to the instruction, which provides that an officer is justified in using force likely to cause death or great bodily harm only when he reasonably believes such force is necessary to prevent death or great bodily harm to himself or another. The trial court declined to add the language, explaining that Grinnall was not applying deadly force to anybody. Defendant argues that Grinnall should have fired his weapon only if he reasonably believed Trixy was a threat to his life or a threat to inflict great bodily injury. Defendant also asserts that Trixy was not a threat to anyone's personal safety.

¶ 60    Lastly, defendant argues that the trial court should have provided not only the bracketed language in IPI Criminal No. 24-25.12 but should have also included IPI Criminal No. 24-25.15, which provides that force likely to cause death or great bodily harm includes the firing of a firearm in the direction of the person to be arrested, even without intent to kill or cause great bodily harm.

¶ 61    The State responds that People's 18 adequately stated the law, especially when read together with the jury instructions as a whole. It argues that the evidence presented clearly demonstrated that the officers used a reasonable level of force in apprehending both defendant and Green, and thus defendant was not unduly prejudiced by People's 18. As to IPI Criminal 24-25.15, the State argues that defendant erroneously asserts that Grinnall fired his weapon in defendant's direction. Rather, it points to Grinnall's testimony and argues that he pointed the gun away from defendant and toward the dog.

¶ 62    We agree with defendant that the trial court erred in omitting from People's 18 both the word "reasonably" and the bracketed portion of IPI Criminal 24-25.12, and that it should have provided the definition of deadly force under IPI Criminal 24-25.15. IPI Criminal No. 24-25.12 provides, in relevant part:

> "A peace officer need not retreat from effort to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he *reasonably* believes to be necessary to effect the arrest or to defend [(himself) (another)] from bodily harm while making the arrest.
>
> [However, he is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent
>
> [1] death or great bodily harm to [(himself) (another)]." (Emphasis added.)

People's 18 provided, in relevant part, that a peace officer is "justified in the use of any force which he believes to be necessary to effect the arrest or defend himself from bodily harm while making the arrest." It therefore omitted the word "reasonably," which would have qualified the officer's belief in his use of force necessary to defend himself while making the arrest with an objective standard.

¶ 63 Furthermore, the instruction did not contain the bracketed portion on use of force likely to cause death or great bodily harm. Here, the officer discharged a firearm in a home as part of the execution of Green's arrest warrant. The discharge of a firearm is certainly force likely to cause death or great bodily harm, and thus the instruction was warranted, even if he did not hit a person. Furthermore, the committee notes say that when giving the first bracketed paragraph, the trial court should also give IPI Criminal No. 24-25.15, which defines force likely to cause death or great bodily harm.

¶ 64 Nevertheless, we find that the instructional errors were harmless, and there can be no plain error if an error is harmless. *People v. Deramus*, 2014 IL App (4th) 130995, ¶ 28; see *People v. Leach*, 2012 IL 111534, ¶ 141 (applying harmless error analysis where defendant failed to argue plain error, "aware that if an error was harmless, it most certainly cannot rise to the level of plain error"); *People v. Sargent*, 239 Ill. 2d 166, 192-93 (2010) (acknowledging opinions where the appellate court held that the failure to tender an instruction based on the Illinois Pattern Jury Instructions was actually harmless and not even subject to plain error). The test for harmless error is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained, and when deciding whether an error is harmless, a reviewing court may focus on the error to determine whether it might have contributed to the conviction. *In re Rolandis*, 232 Ill. 2d 13, 43 (2008).

¶ 65    Here, whether Grinnall was justified in his use of force in shooting the dog simply did not contribute to defendant's convictions, much less threaten to tip the scales on any of defendant's convictions or render his trial unfair. First, defendant's conviction for concealing or aiding a fugitive required that the State prove beyond a reasonable doubt (1) that defendant was not a husband, parent, child, or brother to Green; (2) that Green committed an offense; (3) that defendant knew Green had committed an offense; (4) that defendant harbored Green; and (5) that he harbored Green with intent to prevent his apprehension. See 720 ILCS 5/31-5 (West 2018); Illinois Pattern Jury Instructions, Criminal, No. 22.24. None of these elements depended upon the manner of Grinnall's entry, including whether Grinnall used unreasonable force in entering the apartment, and thus the instructional errors did not contribute to defendant's conviction.

¶ 66    Likewise, defendant's conviction for resisting or obstructing a police officer did not depend on Grinnall's use of force during his entry; it required only that the State prove beyond a reasonable doubt (1) that Grinnall was a peace officer, (2) that defendant knew he was a police officer, and (3) that defendant knowingly resisted or obstructed Grinnall's performance of authorized duties in his official capacity. See 720 ILCS 5/31-1(a) (West 2018); Illinois Pattern Jury Instructions, Criminal, No. 22.14 (approved May 4, 2018). The State's allegation was that defendant refused to be secured in handcuffs during his physical altercation with Grinnall. Our supreme court has stated that "an individual cannot resist or obstruct the arrest of himself or another, whether it is legal or illegal," including resisting the attempt of officers to enter a residence to arrest another. *People v. Villarreal*, 152 Ill. 2d 368, 376-77, 380 (1992).

¶ 67    Finally, defendant's conviction for aggravated battery to a peace officer required that the State prove beyond a reasonable doubt (1) that defendant knowingly made physical contact of an insulting or provoking nature with Grinnall, (2) that he knew Grinnall was a peace officer, (3) that

he knew Grinnall was engaged in the execution of his official duties, and (4) that he was not justified in using the force he used. See 720 ILCS 5/12-3.05(d)(4) (West 2018); IPI Criminal No. 11.16. The fourth element was included because defendant raised the issue of self-defense, which was reflected in the defense's lone jury instruction, providing that "[a] person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against imminent use of unlawful force."

¶ 68    In convicting defendant of aggravated battery of a peace officer, the jury rejected his argument that he was justified in using force against Grinnall. Nothing about the erroneous instructions contributed to the jury's verdict—the jury had to consider whether *defendant* was justified in using force against Grinnall. Defendant's justification did not turn on whether the jury found that Grinnall was justified in using deadly force against the dog but rather it turned on whether the jury determined that Grinnall's gunshot reasonably prompted defendant to use force to protect himself from being shot or harmed next. In other words, defendant's justification in using force against Grinnall was independent of whether Grinnall's use of force on the dog would be found reasonable under the correct jury instruction.

¶ 69    As the instructional errors were harmless, they cannot rise to the level of plain error.[3] In addition, defense counsel could not be ineffective for failing to preserve the harmless errors for review.

---

[3] Even if we were to proceed to the two prongs for plain error, we would conclude for the same reasons that the errors alone simply did not threaten to tip the scales of justice, even if we were to assume the evidence was closely balanced, and that the errors were not serious enough to threaten the fairness of the trial.

¶ 70                              III. CONCLUSION

¶ 71    For the reasons stated, we affirm the judgment of the Carroll County circuit court.

¶ 72    Affirmed.